Please the court. I'm Max Ray here for Reed in this Social Security Disability Supplemental Security Income case. The case is extensively briefed. I come with only three points to argue. The first I would present is that the Commissioner is required to consider all of the evidence and enforcement of this requirement is critical to the integrity of the disability claim. The second point I would make is that there is no way to be certain that a proper weighing has taken place. And in this case, there's no mention of the wife's statement and there's no mention of Dr. Dixon's assessment, notwithstanding this Court's prior direction that his assessment be considered. Second, full consideration of the record could have made a difference. It's not a matter of substantial evidence review, but rather whether the Court can confidently conclude that no reasonable A of J could have reached a different determination had all of the evidence been properly reviewed. It's wrong to give deference to an incomplete determination. That's very different than saying, well, one person could look at the record and find one thing and another could look at the record and find another. The problem here is we lack confidence that the full record received the consideration that it's due. Third point, the improperly rejected evidence should be credited and benefits paid because it shows that the claimant could not have sustained full-time work. Critical that we not view this as a punitive measure. Indeed, the Commissioner has had three opportunities for hearing in this case, but rather it's critical to program integrity that we support the Commissioner in getting these decisions out and done. People have finite lives. Interminable litigation does not serve the interests of the program in getting people benefits while they can still benefit from them. Varney is probably the best policy statement in Ninth Circuit law regarding the credit as true doctrine. Okay, let me ask you this. The linchpin of your argument is the failure of the ALJ to consider the testimony of Dr. Dixon and the written statement of Mrs. Reed. Yes, Your Honor. I've read both of those. Dr. Dixon's testimony seems to me pretty much neither here nor there. I recognize that the ALJ was specifically directed by the prior panel to consider it and in his written decision he gives no evidence of having considered it. That's just clear from the face of it. But as I read Dr. Dixon's testimony, it didn't seem to go much one way or the other. As to Mrs. Reed's statement, maybe I should ask you this. What in that statement would tell us either that we should send it back to the ALJ so that we make sure that he does consider it or, as you're asking, treat it as true and remand for award of benefits? What is it about Mrs. Reed's written, I don't know whether to call it a statement, is she's filling out the form with condescension? She says that this gentleman's mood swings would preclude regular attendance. Lift the mic up a little bit. That'll help. She says that this gentleman's mood swings would preclude regular attendance, and regular attendance is critical. So I'm wondering, does she say exactly that? Can you point us to that? It's page 214, Your Honor. I've got, she noted mood swings would interfere with ability to work on a regular basis. No, I'm on page 227. Is there anything about this person's behavior that would interfere with his or her ability to work on a regular basis? Yes, mood swings. Interfere. That's where I'm coming from, Your Honor. Yeah, interfere is different from prevent, of course. I don't want to parse these things too tightly. I mean, that's the wording of the question, this is a lay person, and so on. Okay, right. I don't mean to go further than what it says, but I want you to see what it says. The other difficulty is on 215. She's talking about day-to-day functioning, and she's talking about the lower back pain was tolerable to, this is a quote, tolerable to tears every day without end. If a pain condition is causing a person to be so impaired as to not be able as to be tearful on a daily basis, that also is a very significant interference with sustained full-time employment. Well, again, I read this, and I understand what she's saying. It ranges from tolerable to tears every day without end. It's not that it's tears every day, but that it ranges from tolerable to tears. I added the word ranges, but as I read that, it says, constant lower back pain that is from tolerable to tears. Doesn't it then say on a daily basis? Yes, every day without end. All right. Well, make of it what we can, but that's where I'm pointing the court's attention. With regard to Dr. Dixon, the important thing there is the cooperation that he provides to psychological factors amplifying this gentleman's pain experience, and indeed the limitations he would experience from the pain beyond what the objective measures alone would show. The administrative law difference, was there any real difference between Dr. Dixon's testimony and Dr. Wall's testimony, the ALJ did here? I think that they're of the same flavor. I think that Dr. Dixon goes some further, and it's cooperative. Having it in the record and considered from two doctors adds strength, and it stands in resistance to the position described by the ALJ at 966, where he says, basically, I've been around a long time, and I just don't see that psychological conditions amplify physical limitations. That's not what this court said the last time around when it discussed somatoform pain disorder, and that's not what Dr. Dixon is saying. He provides added support. Didn't Dr. Dixon, it was a little hard to read his testimony. It is. But he seemed to cast some doubt on the somatoform disorder diagnosis on the grounds that Mr. Reed had actual physical pain. How does that fit into the testimony? His bottom line, yes, indeed, he was doubtful because he tended to believe that there was a physical basis for the pain. But at another point, I ask him, if there is a shortage of physical basis, do we also look to the psychological? And he conceded that, yes, that would be part of the dynamic. Can you explain? I went through Dr. Dieter's analysis of her report, and it seemed to me when I put it side by side with what Mrs. Reed had stated, that Dr. Dieter covered pretty much the same ground and acknowledged the items that Mrs. Reed said in her statement, but ultimately concluded that his ability to work wouldn't be impaired. There is a divergence of conclusions between the observations of the wife who was with him on a regular basis and the one-time snot shot by the examining doctor. That is true, Your Honor. Where were they divergent, though, in identifying the symptoms? So Mrs. Reed says, you know, back pain. Dr. Dieter says back pain. Moodiness, Dr. Dieter, Mrs. Reed says moodiness. Dr. Dieter says moodiness. Where is there a divergence? I think the divergence is at the back end of the report, where Dr. Dieter is not acknowledging work limitations. I think that's where the divergence is. I don't think it's so much in the reporting of symptoms as in the conclusions drawn from her assessment. Is there a difference between her assessment and Mr. Reed's self-assessment in June of 1994? Could you ask again, sir? Yes. Is there a difference between Mrs. Reed's statement and Mr. Reed's own statement, his self-assessment, in June of 1994? Mr. Reed makes a number of comments at different times. Not necessarily consistent. Well, I think it's consistent with a phenomenon of varying experience. Many times folks are not the same every day or over an extended period of time. They're talking about a lot of the same things, but I will not represent to the Court that they're lockstep with one another. Well, sometimes testimony that's entirely consistent among two or three people is a reason to distrust it. I think you're right. I'm not saying as to this one, but perfect consistency is not usually achievable. Why don't we hear from the government, and then we'll give you a chance to respond. Good morning, Your Honors. May it please the Court. David Bloom for the Commissioner. I'd like to pick up on the plaintiff's statement that Judge Seabright was just mentioning, because I think that's key. Mr. Reed did give different assessments of his pain or symptoms over time, but the one he gave in June 1994 was key, because that was the one that most closely resembled a summary of actual work related. You said 94. Do you mean 93? No, I think at page 306 of the record, I believe he gave a self-assessment of his functional capacity as part of a vocational rehabilitation assessment. And in that statement, I think he was very close to indicating that he could do light work. It didn't match exactly, but he indicated that he could lift 21 to 50 pounds, and that he could sit and stand for a combination of five hours a day. Light work generally requires six hours a day. That's pretty close. And furthermore, June 1994 was six months after his December 31, 1993 date last month. He was disabled, disabled on or before December 31, 1993. So, in June 1994, even six months after that, he's still indicating at that point that he can pretty much do light work or something very close to it. So that's fairly good evidence. So where is it in this statement that you say he can do light work? On page 306, he indicates the amount of time that he can sit, stand, walk, and how much he can lift. May I just get the record to take a look? Yes, please. Okay, at the top of the page, he indicates that he can stand for three hours in an eight hour work day, and that he can walk for two hours. Wait, I'm sorry. It does not say eight hour work day. It says in an eight hour day. Well, that's true, but I think the normal way that that phrase is taken, especially on a vocational rehabilitation form, is that we talk about an eight hour work day. I'm not sure about how we talk about it. This is a layperson filling out a form that says in an eight hour day. That does not say work day. Okay. So, he can sit for six hours, okay, and he can stand for three hours. It doesn't say uninterrupted. Okay. That's true. I mean, there are assumptions and inferences here. It's just some evidence. I don't mean to be hostile, but I want to make sure that we get this precisely. Right, and I tried to qualify it by saying that if you take his statement overall, it's close to light work. I mean, it's a fair inference. Okay, so what else do we have here that says that, or at least that supports the idea that he can do light work at this time? The lifting abilities, that's kind of in the middle of the page. It says that he can lift up to 10 pounds frequently, which is the minimum baseline for light work, and he can occasionally lift 21 to 50 pounds, and then he marks closer to 21, while light work generally requires occasionally lifting up to 20 pounds, so that tends to match. But doesn't Mrs. Reed's statement contradict that? Isn't her statement essentially saying he can't do light work, and the ALJ apparently either forgot or somehow did not include any reference to her statement at all? So I'm trying to figure out how we can consider that harmless error if it is inconsistent with the June 1994 self-assessment, because you're arguing that the failure to consider her statement impacted the, I'm sorry, the plaintiff is arguing impacts the credibility of determination regarding Mr. Reed. And so the ALJ didn't put the whole package together in weighing the credibility here if he didn't consider Mrs. Reed's statement, and it seems to me it is somewhat inconsistent with the June 1994 self-assessment. I don't recall where she explicitly said he could not lift a certain amount or could not stand or walk a certain distance. But you're the one asking us to draw inferences, and it seems to me a fair inference from her statement is that he couldn't perform light work. I'll concede maybe, because as Judge Fletcher was talking about, her statement is somewhat vague. It talks about range of pain from tolerable to bad. It talks about his mood being... Tolerable to tears. Tolerable, okay, tolerable to tears. I'm sorry to be a stickler, as I was with the other side. I mean, there are real words there, and as soon as we deviate from them, I'm not sure we're faithful to the meaning. Okay, thank you. Nevertheless, her statement was somewhat vague, and I will contrast it with the lay evidence in the recent Bruce case in which this Court found it was not harmless error in rejecting that lay statement. That one had more details, as I recall, about the claimant specifically being unable to leave the house two days a week, napping for more than an hour every day. Here, in contrast, she says that he naps sometimes up to 30 minutes at a time. The lay statement is just more vague. And furthermore, I guess my overall point about this case is that, I mean, it's clearly been up and down several times. It's an SSR 8320 kind of case where we have to infer the onset date. The Commissioner has found Mr. Reed disabled now as of January 1st, 1995. It's not a case where we continually deny his claim outright. The question is, when did his disability begin? The best evidence for that, according to SSR 8320, is medical expert testimony to infer an onset date. The ALJ did that here. Dr. Wall looked over the evidence and concluded to the best of his ability that Doing that, he had to discount Mr. Reed's own testimony, didn't he, in reaching that conclusion? Somewhat, yes. And Mrs. Reed's statement corroborates a lot of what Mr. Reed said. And you're just arguing, you're not arguing an error wasn't made. You're arguing it was harmless. But I understand the harmless error test to be, if you assume her statement to be true, whether a reasonable ALJ may have decided the case differently. First, I would say there's a divergence in this circuit of what the harmless error test is. Under Stout, it's what you just said. Under Carmichael, another recent case, it's whether there is remaining substantial evidence to support the ALJ's decision. We have that here. But I would say even under the Stout analysis, even if you credit what the lay witness said here as true and you compare it with the rest of the evidence, there's enough other evidence there that any reasonable ALJ would conclude that Reed could perform light work up until 1995. The consultative exams in 1993 are central here. Because despite what Mr. Reed said or despite what Mrs. Reed wrote, actual testing in 1993 by those doctors, both physical and mental, indicated minor limitations, if any at all. During Dr. Dieter's exam, she noted that he was moderately anxious and did not display any pain behaviors. During the physical exam that Dr. Rangich conducted that same year, he found that plaintiff had functioned well on examination testing and he concluded that he did not have any physical limitations. So SSR 8320 says that, yes, when the evidence of onset is unclear, you do look at everything, including plaintiff's testimony and lay statements. But the primary factor you look at is the medical evidence. And that lay evidence can never override or never is too strong a word. But medical evidence in a somatoform disorder case is tricky because by definition a somatoform disorder isn't going to show up physically, it's going to show up mentally and so on. It is tricky in this case and yet Dr. Dieter was aware of that. I mean, she's one of the first ones maybe that even mentioned that possibility and yet she didn't put any additional limitations on Mr. Reed. And during the physical examination, he didn't display, despite his somatoform disorder, he didn't display enough pain behavior to justify physical limitations at that time. Everybody agrees that he got worse and that he got progressively worse. Part of the problem here is that several medical experts now have looked at this case and have been unable to determine precisely when, between 1993 and 1995, he got so bad, so impaired that he was disabled. Give me a hand here so I understand a little bit of what's at stake. Roughly speaking, what kind of dollar differences are we talking about Title II compared to Title XVI? I was afraid you were going to ask that question. I was looking into that the past two days. I don't have a precise figure. If he gets additional SSI benefits going back through 1994, so you're talking in the thousands of dollars for that year. If he qualifies for disability insurance benefits, that is, was disabled before the end of 1993, from then to now we're talking tens of thousands of dollars, a substantial sum. Can you do it in terms of dollars per month? It can vary from a few hundred dollars a month difference to much more than that. What it was for him, I don't know. But in the lives of these people, it's real money. Yes, it's a substantial sum, especially if he qualifies for Title II disability benefits. It's the Title II that's the big bump up. Yes. So it's a tough case. The ALJ, I mean, the remand instructions told him to focus on plaintiff's credibility. He gave several reasons to find plaintiff not credible. In doing so, he followed the testimony of Dr. Wall. So it's not as if he came up with these reasons out of the blue. Dr. Wall says, you know, on that Minnesota multiphasic test, he, quote, faked bad. Right. And he gave other reasons. Doctor, even back in 1991 or so, Dr. Pentecost had some doubts about plaintiff's motivation. But to be fair, I mean, his mental impairments have some impact on that as well. So the doctors did the best they could. The ALJ resolved the evidence, pushed the onset date back to January 1, 1995. No doctor has said that he was disabled before that. So it's a reasonable interpretation of the evidence overall. Okay. Thank you. Thank you. Mr. Wray, would you like a minute to respond? I'd like to just make two quick statements. First of all, regarding page 306 of the record, that's the questionnaire that's referred to, the very bottom line, other problems, psychological stress, in this case, that's a small line, but it has a huge impact when you interpret what this document as a whole means in terms of sustained work capacity. I'm sorry. Where are you finding psychological stress? Right above the claimant's signature. F, other. Explain psychological stress. My psychological. Oh, yes, I got you. Psychological stress. That's a little hard to read. I got it. Yeah. I want to point that out because I think it's significant. The other thing is the use of a medical expert. Having a medical expert is to help the judge to analyze the record. It's not to replace the analysis of the record by the judge. And as you read the judge's decision, rather than talking about Dixon, rather than talking about a number of other points in the records, he asks the medical expert, well, where does this take us? And while that's an appropriate question, it's not the expert's call to make. His call is to assist the judge in the judge's analysis. Thank you. Thank you. Thank you very much. The case of Reed v. Astor is now submitted for decision. The next case on the calendar, Bonner v. Hill, has been submitted on the briefs. The next case on the argument calendar is Nunez v. Duncan. Thank you. Are you just showing up and are you jangled because you're just showing up? We can put your case off and hear it next if you like.
judges: Fletcher W. , Ikuta, Seabright